**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **GREENUP** | * **CIVIL ACTION** |
| **INDUSTRIES LLC** | * |
| | * **NO. 22-2203** |
| **VERSUS** | * |
| | * **SECTION: "L" (4)** |
| **FIVE S GROUP, LLC ET AL** | * |
| | * |

**ORDER AND REASONS**

Before the Court are Motions to Dismiss Defendants' First Amended and Restated Counterclaim by Plaintiff Greenup Industries, at R. Doc. 24, and Markel Insurance Company, at R. Doc. 25. Defendants have filed memoranda in opposition, at R. Doc. 29 and R. Doc. 28.

I.      BACKGROUND

This case arises from a contract between Greenup Industries, LLC ("Greenup") the Contractor, and Five S Group, LLC ("Five S"), the Subcontractor, to excavate fill from the Bonnet Carre Spillway and transport it to another site, in fulfillment of a contract Greenup was awarded by the United States Army Corps of Engineers' ("USACE") to complete work related to its Hurricane Storm Damage Risk Reduction Project.

Greenup alleges that it entered into a subcontract ("Subcontract") with Five S on October 26, 2020, in which Five S agreed to provide labor and equipment to excavate 1,000,000 cubic yards ("CY") of fill from the Bonnet Carre Spillway, and that Hartford then issued a performance bond on behalf of Five S in the amount of $9,472,000.00. *Id.* at 2. Both parties note that the Subcontract schedule called for the fill to be excavated over 15 months, requiring that Five S excavate and transport an average of 66,667 CY of fill each month. *Id.* at 3; R. Doc. 29 at 2. The Subcontract provided that the fill was to be excavated from a "borrow pit," and moved to

1

a stockpile. R. Doc. 18-1 at 19.

Greenup alleges that USACE began raising issues about Five S's lack of performance in "late 2021." R. Doc. 1-1 at 3. Among the concerns, Greenup alleges, were broken equipment left onsite, excessive employee turnover, and a lack of processing equipment that resulted in failed quality tests regarding the moisture content of the fill. *Id.* at 4. Five S, by contrast, alleges that, while it "mobilized sufficient equipment and labor" to finish the project on schedule, Greenup's breach of performance caused its inability to meet the Project timeline. R. Doc. 18 at 4. On November 21, 2021, Five S's area manager, Justin Mibbs, sent Greenup a letter alleging that, despite an initial agreement that Greenup would provide Five S 40-50 trucks a day to transport the fill from the borrow site to the stockpile, "Greenup so far has been providing only about 8 or 9 trucks a day." R. Doc. 18-3 at 1. In the letter, Mibbs alleged that the small number of trucks provided would delay the project's completion by four years, and informed Greenup that it was "submitting an application for payment of 85% of our daily cost of keeping equipment and labor at the borrow pit" until "Greenup increases its number of trucks at the site." *Id.* at 2. Greenup's counsel, Etienne Balart, replied to the letter on November 15, 2021, stating that Greenup viewed the request for daily costs as "outside of the terms of the Subcontract" because "5S agreed to be paid pursuant to the line items set forth in Exhibit B" and that these line items "must be based upon USACE approved calculations of in-place quantities." R. Doc. 18-4 at 1.

Over the next five months, the problems regarding the pace of the work did not abate. Monthly schedule updates issued by Greenup from December 2021 to April 2022 all note delays due to inadequate number of trucks and difficulties "keeping trucks onsite and available." R. Doc. 29-1 at 2-5. Greenup alleges that, on April 12, 2022, Five S sent a demand letter re-emphasizing its November 1, 2021 request and notifying Greenup that it had de-mobilized from

the site and would not resume until Greenup agreed to pay for past and future standby time. R. Doc. 1-1 at 4. Greenup further alleges that Five S demobilized from the site "well before March 15, 2022" and that Five S "made clear its intent to abandon the job well before any 'declaration' of alleged default." *Id.* at 5. Five S alleges that it was "excused from further performance under the Subcontract" when Greenup breached its obligations to supply sufficient trucks and to pay Five S for the services it provided under contract. R. Doc. 29 at 5.

On May 27, 2022, Greenup sued Five S and its insurer, Hartford Fire Insurance Company ("Hartford"), in Orleans Parish civil court, seeking a declaratory judgment that Five S "does not have a legal or contractual basis to put Greenup in default and to discontinue its obligations under the Subcontract" and that any payment to Five S was conditioned upon Greenup's receipt of USACE funds. R. Doc. 1-1 at 7. Greenup also made claims for breach of contract and indemnity against Five S and repeated its claims for declaratory judgment against Hartford, *id.* at 7-8, and sought attorney's fees from Hartford, *id.* at 9. On July 15, 2022, Five S and Hartford removed the case to federal court, R. Doc. 1 at 6, under 28 U.S.C. § 1442(a)(1), asserting that removal was proper because Five S acted at the direction of the USACE, and because Greenup's claims rested on the Miller Act, at 40 U.S.C. § 3133(b)(3), which is under exclusive federal jurisdiction. *Id.*

On July 22, 2022, Five S and Hartford filed a counterclaim against Greenup and its insurer, which Defendants named as "ABC Insurance Company." R. Doc. 18 at 9.  On September 20, 2022, Five S and Hartford filed an amended counterclaim against Greenup and its actual insurer, Markel Insurance Company. R. Doc. 18. Against Greenup, Five S and Hartford allege breach of contract. Against both Greenup and Markel, Five S and Hartford allege claims under the Miller Act for Greenup's failure to pay Five S out of the Payment Bond that Markel

3

issued for the work. Five S and Hartford also bring claims against Greenup and Markel under the Louisiana Prompt Payment Act, alleging that Greenup failed to remit payment within 14 days of receiving those funds from the USACE. R. Doc. 18 at 11-12.

## II.    PRESENT MOTIONS

Movants seek to dismiss the counterclaims that Five S and Hartford allege against Greenup and Markel in Defendants' First Amended Counterclaim, at R. Doc. 18, for failure to state a claim upon which relief can be granted. R. Doc. 24; R. Doc. 25.

Greenup and Markel argue that Five S and Hartford's counterclaims should be dismissed because they have failed to state a claim under state contract law, the Miller Act, or the Louisiana Prompt Payment Act. Greenup and Markel contend that the language of the Subcontract did not oblige Greenup to provide trucks to Five S for transporting fill dug out of the Spillway, or to pay for "standby time" that accrued when Five S alleges that it was unable to maintain necessary production levels because it did not have enough trucks on which it could load fill. Greenup and Markel argue that the Subcontract does not include any "agreed schedule other than what is required in the Prime Contract," or a schedule or rate for trucks, and that Five S agreed to "wait for payment from Greenup based on USACES acceptance of 'in-place quantities'" of fill.

Five S and Hartford filed memoranda in opposition, arguing that Greenup and Markel are not entitled to a dismissal because there is enough evidence supporting their claim for relief based on the plain language of the contract. Central to their claim is that the Subcontract "specifically incorporates, inter alia, the Subcontractor's Bid Proposal," which contained a schedule for production, a reference to Greenup's provision of trucks, and a statement that Five S "may invoice for standby time if daily production falls below the specified production rate

4

because of insufficient trucking." Further, Five S and Hartford argue, the Miller Act allows subcontractors to recover for delays and when subcontractors cannot, because of a breach by a contractor, use equipment to its "full potential."

### III.   APPLICABLE LAW

Federal Rule of Civil Procedure 12(b)(6) provides that an action may be dismissed "for failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556. A claim is plausible on its face when the plaintiff has pled facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 570. Although a court must liberally construe the complaint in light most favorable to the plaintiff, accept the plaintiff's allegations as true, and draw all reasonable inferences in favor of the plaintiff, *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996), courts "do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions*." Arias-Benn v. State Farm Fire & Cas. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)).

### IV.   ANALYSIS

#### A.  Five S and Hartford's Breach of Contract Claim Against Greenup

Greenup alleges that Five S and Hartford fail to state a breach of contract claim because the clear and unambiguous terms of Subcontract do not provide Greenup with an obligation to pay for "standby time" or with a "required schedule that could serve as the basis for an alleged breach of contract." R. Doc. 24-1 at 8. According to Greenup, the contract at issue here does not

contain a schedule other than that which is required in the Prime Contract and there is no

schedule or rate provided for trucks. *Id.* at 9-10. Further, Greenup argues, the language of the

Subcontract obligated Five S to wait until USACE accepted "in-place quantities" to be paid. *Id.*

at 10.

Greenup relies on two particular clauses in the Subcontract to make its argument that it

had no contractual obligation to provide trucks or to pay Five S on any schedule other than when

USACE approved "in-place quantities," and paid Greenup, after which time Greenup would

disburse payment to Five S. First, Greenup points to the Section 1.2 of the Subcontract, which

provides the list of documents that comprise the Subcontract:

> The Subcontract Documents consist of: (i) this Subcontract, including all exhibits,
> schedules, and attachments; (ii) the Prime Contract; (iii) any other documents
> incorporated into or referenced in the Prime Contract that apply, govern, or relate to the
> Work. including, without limitation, all drawings, plans, specifications, standards,
> schedules, and addenda (the "Other Prime Documents"); (iv) any changes, modifications
> or amendments to this Subcontract authorized by the terms hereof and any changes,
> modifications or amendments to the Prime Contract or the Other Prime Documents taking
> effect after the date of this Subcontract provided Subcontractor has access to such
> modifications and amendments, and (v) Subcontractor's Bid Proposal. The documents
> mentioned in subsections (ii) – (v) above are incorporated into and form an integral part
> of this Subcontract as if attached to this Subcontract or repeated herein, **but in the event
> of any conflict between the documents identified in (ii) – (iv) and the document
> identified in (v), the provisions of (ii) –  (iv) shall take precedence.**

Second, Greenup argues that Section 3.3—which it calls the "pay when paid" clause—precludes

any other payments provided by Greenup to Five S other than those triggered when USACE

evaluates "in-place quantities" of material and pays Greenup for those quantities:

> Notwithstanding anything to the contrary in this Subcontract, in the Prime Contract, or in
> any bond or other document, Greenup's and/or Project Owner's approval of the Work for
> which payment is requested and Freenup's actual receipt of payment from Project Owner
> for such Work shall trigger the right of Subcontractor to receive payment, in any form
> whatsoever, from Greenup. It is the intent of this provision that this "pay when paid"
> clause shall operate to simply defer the obligations of Greenup with respect to payment
> for the Work herin, but in no event shall the inability of Owner to pay Greenup any sums

for the Work operate as a condition precedent to the obligation of Greenip to pay Subcontractor. Both progress payments and final payment to Subcontractor shall be made only out of funds actually received by Greenup from Project Owner directly for the Work performed by Subcontractor in strict accordance with this Subcontractor and approved and accepted by Greenup and/or Project Owner.

Greenup essentially contends that, because there is no language in the Subcontract about Greenup providing trucks or paying for "standby time," the language in the Bid Proposal that suggests that Greenup has an obligation to do so is in conflict with the Subcontract. As a result, Greenup argues, the language of the Bid Proposal is knocked out by the Subcontract.

Five S argues that these are additional terms to the contract rather than terms that conflict with the language of the Subcontract document. Specifically, Five S and Hartford argue that the subcontract "specifically incorporates" the Bid Proposal, including its provisions that "Our proposal is based upon a 6,00 CY/day (survey measure) production factor, working a minimum 6 days/week 10 hours/shift" and "If General Contractor elects to provide a 3rd party trucking service, Five-S reserves the right to invoice for standby time if daily production falls below the specified production rate due to inadequate trucking." R. Doc. 18-2 at 3. Additionally, Five S points to the Schedule that it affixed to the Bid Proposal, which includes dates for the completion of certain benchmarks.

Louisiana law provides that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046. In the context of a 12(b)(6) motion, if "a dispute focuses on contested contract terms, and those terms are clear and unambiguous, their proper interpretation is a question of law for the Court to decide rather than a question of fact for a jury to decide." *Crane Co. v. Coltec Indus.*, 1999 U.S. Dist. LEXIS 685, at *8 (S.D.N.Y. Jan. 28, 1999). In this

instance, Five S has pointed to language in the Subcontract and incorporated Bid Proposal that indicates that there is ambiguity as to whether the terms regarding trucks and standby time are additional to or conflicting with those of the Subcontract. Five S's counterclaim thus contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### B.   Five S and Hartford's Miller Act Claim Against Greenup and Markel

The Miller Act provides a right to bring a civil action to "[e]very person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under [the Miller Act] and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made." 40 U.S.C.S. § 3133. Greenup argues that "[b]ecause the Subcontract does not obligate Greenup to provide trucking or to provide payment for standby time . . . Greenup is not a 'defaulting contractor' whose obligations Hartford must make good." R. Doc. 24-1 at 14. Further, Greenup contends that the "pay when paid" clause precludes Five S's Miller Act claim because Five S "has not alleged that USACE has made payment to Greenup" for amounts chargeable to the USACE, but rather, "is claiming non-payment for an item outside the scope of the Subcontract." R. Doc. 24-1 at 15. Markel argues that, as surety, it "cannot be obligated to pay sums that Greenup is not obligated to pay, or for which Greenup is not being compensated by the USACE." R. Doc. 25-1 at 10.

In response, Five S and Hartford cite the D.C. Circuit's holding that "[w]ith respect to pieces of equipment that were present at [a subcontractor's work] site and used with regularity, awarding the costs of standby time is consistent with the text and purposes of the Miller Act." *United States ex rel. Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, P.C.*, 345 F. Supp. 3d 11, 48 (D.D.C. 2018). And in the Fifth Circuit, under the Miller Act, "a subcontractor

can recover increased out-of-pocket costs for labor and materials furnished in the course of performing its subcontract caused by contractor or government delay." *United States v. Millers Mut. Fire Ins. Co.*, 942 F.2d 946, 951 (5th Cir. 1991).

Again, construing the counterclaim in the light most favorable to Five S, there are terms in the contract regarding standby time and trucking that render impossible Greenup's contention that the contract is unambiguous on its face. Because there is ambiguity in the terms of the contract and because the Fifth Circuit has held that parties can sue under the Miller Act for daily expenses incurred due to contractor delays, Five S and Hartford have stated a valid Miller Act claim.

### C. Five S and Hartford's Louisiana Prompt Payment Act Claim Against Greenup and Markel

With regard to the Louisiana Prompt Payment Act claim against Markel, Markel argues that it is an improper defendant because the Louisiana Prompt Payment Act does not allow suppliers to recover against sureties under a Miller Act theory. Five S and Hartford do not address Markel's argument in their opposition memoranda.

The law supports Markel's position here. "While the Miller Act is not the exclusive remedy available to suppliers in some cases, it is the exclusive remedy available to a supplier against a surety . . . on a Miller Act payment bond." *Bernard Lumber Co. v. Lanier-Gervais Corp.*, 560 So. 2d 465, 467 (La. Ct. App. 1990).

Because Counterclaimants cannot recover against Markel under the Louisiana Prompt Payment Act even if it is successful on its Miller Act theory against Greenup, on this claim Five S and Hartford fail to state a claim upon which relief can be granted.

## V.    JUDGMENT

Markel's Motion to Dismiss Defendants' First Amended and Restated Counterclaim, at R. Doc. 25, is **GRANTED** with regards to the Louisiana Prompt Payment Act claim against it. The motion is **DENIED** with respect to the Miller Act claim. Greenup's Motion to Dismiss Defendants' First Amended and Restated Counterclaim, at R. Doc. 24, is **DENIED**.

New Orleans, Louisiana, this 16th day of March, 2023.

**THE HONORABLE ELDON E. FALLON**
**UNITED STATES DISTRICT JUDGE**